**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **Jennifer E. H.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:18-CV-1767-BH** |
| | § | |
| **NANCY A. BERRYHILL, ACTING** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Consent[1]** |

## MEMORANDUM OPINION AND ORDER

Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is

**REVERSED**, and the case is **REMANDED** for further administrative proceedings.

## I. BACKGROUND

Jennifer E. H. (Plaintiff) seeks judicial review of a final decision by the Commissioner of

Social Security (Commissioner) denying her claim for disability insurance benefits (DIB) under

Title II of the Social Security Act (Act). (*See* docs. 1; 13.)

### A.    Procedural History

On September 21, 2015, Plaintiff filed her application for DIB, alleging disability beginning

on March 28, 2015. (doc. 10-1 at 62.)[2]  Her claim was denied on January 29, 2016, and upon

reconsideration on July 12, 2016. (*Id*. at 71, 79.)  On July 26, 2016, she requested a hearing before

an Administrative Law Judge (ALJ). (*Id*. at 82.)  She appeared and testified at a hearing on May 10,

---

[1] By consent of the parties and the order of transfer dated October 18, 2018 (doc. 15), this case has been transferred for the conduct of all further proceedings and the entry of judgment.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

2017.  (*Id*. at 30-54.)  On July 12, 2017, the ALJ issued a decision finding that she was not disabled and denying her claim for benefits.  (*Id*. at 15-25.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on September 7, 2017. (*Id*. at 133.)  The Appeals Council denied her request for review on May 12, 2018, making the ALJ's decision the final decision of the Commissioner.  (*Id*. at 4.)  Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

B.    **Factual History**

1.    **Age, Education, and Work Experience**

Plaintiff was born on October 8, 1987, and was 29 years old at the time of the hearing.  (doc. 10-1 at 24, 30-32.)  She had at least a high school education and could communicate in English.  (*Id*. at 24.)

2.    **Medical Evidence**

On February 5, 2015, Plaintiff met with Linesse Vega, M.D., at the Child and Family Guidance Center for mental health treatment.  (*Id*. at 222.)  She had a depressed mood, but it was stable and improved, and she denied suicidal or homicidal ideation.  (*Id*.)  She was alert and pleasant, with constricted affect.  (*Id*.)  Dr. Vega diagnosed her with bipolar II disorder, and rated her Global Assessment of Functioning (GAF) score at 50-55.  (*Id*.)  She prescribed Plaintiff Seroquel, Lamictal, and Cogentin.  (*Id*.)

On April 30, 2015, Plaintiff saw Jason Medina, M.D., at Lake Pointe Medical Partners for medication refills and treatment of migraine headaches.  (*Id*. at 223-28.)  Her migraines had increased recently because of some smells in her house.  (*Id*. at 223.)  Propranol was working, but smells would sometimes cause her to have migraines.  (*Id*.)  She was oriented to time, place, and situation, and had appropriate mood and affect, normal insight, and normal judgment.  (*Id*. at 226-

2

27.) She was diagnosed with migraines, unspecified, without mention of intractable migraines or status migrainosus. (*Id*. at 227.)

On May 5, 2015, July 4, 2015, and November 20, 2015, Plaintiff again met with Dr. Vega for treatment. (*Id*. at 219-21.) In May, she reported increased sadness, lability, hopelessness, appetite, and sleep, and she was alert, oriented times three, goal directed, and pleasant but fidgety. (*Id*. at 221.) Her mood was sad and affect was constricted. (*Id*.) In July, she was stable and doing well, and she had gained 70 pounds, but no physical health concerns were noted. (*Id*. at 220.) She was alert and oriented, and her mood was good. (*Id*.) In May and July, she was diagnosed with bipolar II disorder, and Dr. Vega altered her medications by adding Lexapro in May, and replacing Seroquel with Latuda in July. (*Id*. at 220-21.) Her GAF score in those months was 55. (*Id*.) In November, Plaintiff was stable, doing well, alert, oriented, pleasant, future-oriented, and in a good mood, and her speech was goal-directed. (*Id*. at 219.) She had no suicidal or homicidal ideation, and Dr. Vega assessed her with bipolar disorder and generalized anxiety disorder. (*Id*.) Her GAF score increased to 58, and she was continued on the same medications. (*Id*.)

On December 14, 2015, Plaintiff again saw Dr. Medina for a follow-up on her medications. (*Id*. at 229.) She had been using Maxalt 2-3 times per month, but felt that Inderal had significantly decreased her migraines. (*Id*.) She was oriented times four, and had appropriate mood and affect, normal insight, and normal judgment. (*Id*. at 232.) Her assessments remained the same as during her prior appointment. (*Id*.)

On February 13, 2016, Plaintiff saw Dr. Vega for mental health treatment. (*Id*. at 269.) She reported no more depressive symptoms, no suicidal or homicidal ideation, and her mood and affect were euthymic and better. (*Id*.) She was stable, and her GAF score was 55. (*Id*.)

On March 25, 2016, Dr. Vega completed a mental medical source statement for Plaintiff.

(*Id*. at 237-42.)  Plaintiff was doing well, but she had difficulties with concentration and staying on task.  (*Id*. at 237.)  She had decreased energy, generalized persistent anxiety, difficulty thinking or concentrating, sleep disturbance, and recurrent severe panic attacks, and she was easily distracted. (*Id*. at 238.)  Dr. Vega opined that Plaintiff was seriously limited or unable to meet competitive standards for remembering work-like procedures; understanding, remembering, and carrying out short and simple instructions; working in coordination with others; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a reasonable pace; dealing with work stress; responding appropriately to changes in a routine work setting; and getting along with others.  (*Id*. at 239-40.)  She found that Plaintiff was seriously limited in interacting appropriately with the general public and maintaining socially appropriate behavior. (*Id*. at 240.)  She further opined that Plaintiff was unable to understand, remember, and carry out detailed instructions, and that she could be expected to miss more than four days of work per month due to her impairments.  (*Id*. at 240-41.)  Dr. Vega noted that Plaintiff's highest GAF score in the prior year and at the time of the statement was between 50 and 55, and her prognosis was fair to guarded.  (*Id*. at 237.)  Dr. Vega concluded that Plaintiff impairments were reasonably consistent with the symptoms and functional limitations described in her evaluation.  (*Id*. at 241.)

From June 4, 2016 to March 22, 2017, Plaintiff saw Dr. Vega almost monthly for mental health treatment.  (*Id*. at 261-68.)  In June, her behavior was engaged, her speech was goal-oriented and soft, and her mood and affect were sad.  (*Id*. at 268.)  In July, Plaintiff reported mood issues, sleep frustration, being overwhelmed at times, and headaches.  (*Id*. at 266.)  In August, she was stable on her medications, and her behavior was pleasant, her speech was goal-oriented, and her mood and affect were anxious.  (*Id*. at 265.)  In October, she reported difficulty with her high school reunion, her mood and affect were dysphoric, and her speech was goal-oriented.  (*Id*. at 264.)  In

4

November, her mood was improved, her behavior was calm, her speech was goal-oriented, and she denied having manic or depressive symptoms. (*Id*. at 263.) In January, Plaintiff reported no depression and good results on her medication regimen, and she was calm with euthymic mood and affect. (*Id*. at 262.) In March, she reported that her depression was controlled, her mood was stable, and she had been sleeping well. (*Id*. at 261.) She was cooperative, euthymic, and had good rapport, logical thought process, and good insight. (*Id*.) Throughout her appointments, she had no suicidal or homicidal ideation, and her GAF scores were between 50 and 55. (*Id*. at 261-68.)

On June 5, 2016, in her Function Report - Adult, Plaintiff reported that she lived with her family. (*Id*. at 177.) Her migraines kept her from attending or completing shifts, and working caused an increase in her anxiety and panic attacks and flare-ups in her bipolar disorder. (*Id*.) Her daily activities consisted of waking up, feeding her dog and taking her outside, eating breakfast, and going back to bed to either sleep or watch YouTube. (*Id*. at 178.) She would also possibly eat lunch, run errands, eat dinner, and then go back to sleep. (*Id*.) She took care of her dog, but her mother helped her pay for all of the dog's things. (*Id*.) Her conditions caused her to either sleep all day or not sleep at all. (*Id*.) She changed her clothes about three times per week, bathed and cared for her hair about 1-2 times per week, and fed herself 1-3 times per day. (*Id*.) She needed reminders to eat, dress, and take medication, but she could prepare her own meals. (*Id*. at 179.) She could sweep, vacuum, and dust with encouragement and reminders, and she did those things about twice every two weeks. (*Id*.) She went outside a few times per day to take the dog out, and she could drive and ride in a car for travel. (*Id*. at 180.) She could go out alone most of the time, but sometimes she would get panicky about other people and crowds. (*Id*.) She was also able to shop in stores and online, and she could count change and use a checkbook, but could not pay bills or handle a savings account because she did not have money to do those things. (*Id*.) She talked to

others and occasionally went out with others for food; she also went to Kroger and Walgreens on the regular basis to pick up medications. (*Id*. at 181.) She reported some issues in getting along with her extended family because they did not know how to handle her bipolar disorder. (*Id*. at 182.) She felt that her conditions affected her abilities to memorize, complete tasks, concentrate, understand, follow instructions, and get along with others. (*Id*.) She could follow written instructions pretty well, but she could not follow spoken instructions as well. (*Id*.) She got along well with authority figures if they were patient with her, but she did not handle stress very well and did not do well with changes in routine. (*Id*. at 183.)

On December 28, 2016, Plaintiff returned to see Dr. Medina for medication refills, and she reported doing well with her migraines; there were no issues with her medication. (*Id*. at 255.) She was stable on her medication, and her diagnoses remained the same as during her prior appointments with him. (*Id*. at 259.)

On May 10, 2017, Plaintiff's mother submitted a statement to the ALJ. (*Id*. at 217.) It stated that Plaintiff had been unable to work since April 2015, due to bipolar disease, migraines, and anxiety. (*Id*.) Since diagnosed, Plaintiff had become progressively worse. (*Id*.) Plaintiff was unable to handle finances, and she had decreased social ability, decreased energy, and distractability. (*Id*.) Plaintiff spent 90% of her time in her room and mostly had social contact only through Facebook; she was easily fatigued, had trouble sleeping, and suffered migraines that incapacitated her for 2-3 days at a time; and she had to read aloud to understand, would forget what she was saying mid-sentence, and had trouble formulating words. (*Id*.)

### 3. Hearing Testimony

On May 10, 2017, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (*Id*. at 30-54.) Plaintiff was represented by an attorney. (*Id*. at 32-33.)

Plaintiff testified that she lived at home with her mother, was not working, and been driven to the hearing by her mother. (*Id*. at 35, 37.) She only drove about once a week and only for short distances. (*Id*. at 35.) She completed chores around the house such as sweeping, vacuuming, and doing the dishes, but had to be reminded. (*Id*. at 49.) She had some college education but had to stop attending school on several occasions because of her anxiety. (*Id*. at 37, 41-42.) She would get really panicky that she was going to miss class, be called on by the teacher, or be late in front of others. (*Id*. at 42.) She was about nine hours short of what was needed to acquire a degree. (*Id*. at 41.)

She had a history of working multiple sales clerk positions, and had resigned from her last job due to her migraines and anxiety from changes at the workplace. (*Id*. at 37-39.) She had also left her previous job due to her anxiety because she had a severe panic attack and cried in the middle of the store. (*Id*. at 39.) She usually cried on a weekly basis when she would get home from work. (*Id*.) She was also reprimanded once at that job when she needed to go home early because she could not take working anymore. (*Id*. at 40.) She generally worked part-time, and if she was ever late to work it was within 10 minutes and she would call to let her employer know she was running late. (*Id*. at 42.) She did have to leave early 2-3 times during the last year she worked because she was anxious, sick, or had migraines. (*Id*.) She had financial issues in the past and had fallen into debt on three separate occasions. (*Id*. at 46.)

Plaintiff first began receiving psychiatric treatment in 2006-2007, because everyday she would feel really sad or happy, and her mood would fluctuate. (*Id*. at 41.) Her father's side of the family had a history of psychiatric issues, and there had been two suicides that she was aware of. (*Id*.) She suffered migraines but felt that they were getting better over time due to her medication.

(*Id*. at 43.)  She was starting to get a different kind of migraine, however.  (*Id*.)  Some of her friends also had similar migraines.  (*Id*.)  She would socialize with friends anytime, but she had last left the house to see friends the previous September for her 10-year high school reunion.  (*Id*. at 44.)  She cried three times at the reunion due to her anxiety.  (*Id*.)

She slept well at night and usually did not wake up until her mom woke up for work in the morning.  (*Id*. at 45.)  She sometimes napped during the day, but she would then get up.  (*Id*.)  She used to be physically active, enjoyed reading but was unable to complete reading entire novels, and sometimes watched movies and television.  (*Id*. at 44-46.)  She had a cell phone and a Facebook account, and she used the internet on her phone to access maps, her bank account, and her Facebook account.  (*Id*. at 36.)  She also had a Nook and used a laptop, and she had been conducting research because she was trying to write a book about her Facebook posts.  (*Id*.)  She isolated herself in her room at times and would not come out for the entire day.  (*Id*. at 47.)  She also did not really go anywhere.  (*Id*.)  When she did go places, she would have to rest the following day due to the stress.  (*Id*. at 47-48.)  On vacation, she stayed in the hotel about 3-4 days out of 14.  (*Id*. at 48.)  At home, she would get stressed by the dogs, or if something did not work correctly in the house, and she would stress that she was going to receive a letter about her credit cards.  (*Id*. at 49-50.)

She took medication for her migraines, bipolar disorder, and anxiety, which had caused her to gain weight, but she did not think that they had any side effects.  (*Id*. at 35, 45, 48.)  She had missed taking her medication before because it was out of stock at the store.  (*Id*. at 48.)  For migraines, she took a preventative daily medication and another medication that helped in case she suffered a migraine.  (*Id*. at 48-49.)

### b.    *VE's testimony*

The VE determined that Plaintiff's work history included a job as a records clerk, DOT

245.362-010 (light, SVP 4), and two jobs as a sales person, DOT 261.357-066 (light, SVP 3), and DOT 279.357-054 (light, SVP 3). (*Id.* at 51.)

The VE considered a hypothetical individual with the same age, education, and work history as Plaintiff who had no exertional limitations, and could understand, remember, and carry out detailed but not complex instructions; attend and concentrate for extended periods; make basic decisions; frequently interact with coworkers and supervisors; respond to changes in a routine work setting; and not have more than occasional contact with the public. (*Id.* at 51-52.) This individual would be able to perform Plaintiff's past work as a records clerk, but could not perform either of the sales positions. (*Id.* at 52.) This individual could also perform other work as a cleaner, DOT 323/687-010 (medium, SVP 2), with 328,000 jobs nationally and 19,000 jobs in Texas; kitchen helper, DOT 318.687-058 (medium, SVP 2), with 366,000 jobs nationally and 16,000 jobs in Texas; and order puller, DOT 922.687-058 (medium, SVP 2), with 180,000 jobs nationally and 6,000 jobs in Texas. (*Id.*)

The VE then considered the same hypothetical individual, except that the individual could not engage in sustained work activity for a full 8-hour day in a regular work week without interruption from psychologically based symptoms. (*Id.*) This individual would not be able to perform any of Plaintiff's past work or other work. (*Id.*)

Regarding the first hypothetical individual, the tolerance for absences would be one day per month, and the individual could be off task no more than 10% of the time. (*Id.* at 53.) The VE's testimony was consistent with the Dictionary of Occupational Titles (DOT), Social Security Rulings (SSR), and his own experience. (*Id.* at 53.)

## C.     **ALJ's Findings**

The ALJ issued her decision denying benefits on July 12, 2017. (*Id.* at 15-25.) At step one,

the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 28, 2015, her alleged onset date. (*Id*. at 17.) At step two, the ALJ found that Plaintiff had the following severe impairments: anxiety and bipolar disorder. (*Id*. at 17-18.) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairments or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (*Id*. at 20.)

Next, the ALJ determined that Plaintiff retained the RFC to perform a full range of work at all exertional levels, except that she could understand, remember, and carry out detailed but non-complex instructions; attend and concentrate for extended periods; make basic decisions; respond to changes in a routine work setting; frequently interact with coworkers and supervisors; and have no more than occasional contact with the public. (*Id*. at 21.)

At step four, the ALJ determined that Plaintiff did not have past relevant work experience. (*Id*. at 23-24.)[3] At step five, the ALJ found that transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Plaintiff was not disabled, but considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform. (*Id*. at 24.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Act, from March 28, 2015, the alleged onset date, through September 30, 2015. (*Id*. at 25.)

## II.  STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner

---

[3] The ALJ determined that although the VE testified that Plaintiff had past relevant work experience as a records clerk, her earnings records failed to support a finding that she earned more than the values established in the applicable regulations, and therefore her work as a records clerk was not past relevant work because it did not constitute substantial gainful activity. (doc. 10-1 at 23-24.)

applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are also identical to those governing the determination under a claim for supplemental security income. *See id*. Courts may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*.

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v.*

*Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.    If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability.

*Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id*.  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis.

*Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## III. ISSUE FOR REVIEW

In her only issue for review, Plaintiff argues that "[t]he ALJ improperly weighed medical opinions of record." (doc. 13 at 1, 8-9.) She specifically asserts that the ALJ erred in evaluating Dr. Vega's medical source statement because she improperly relied on GAF scores and failed to analyze her opinions under 20 C.F.R. § 404.1527 and SSR 96-2p. (*Id*. at 9-19.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. § 404.1529(b). Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. *Id*. §§ 404.1527(c)(2), 416.927(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id*. § 404.1502.

## A.     GAF Scores

Plaintiff first claims that the ALJ could not rely on her GAF scores to "invalidate a treating specialist's opinion" because they were improperly classified as showing moderate impairments when her "numerous scores" of 50 indicated serious impairments. (doc. 13 at 9-10.)

GAF scores provide a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health. *See Boyd v. Apfel*, 239 F.3d 698, 700 n.2 (5th Cir. 2001). "[F]ederal courts have declined to find [] a strong correlation between an individual's GAF score and the ability or inability to work." *Jackson v. Colvin*, No. 4:14-CV-756-A, 2015 WL 7681262, at *3 (N.D. Tex. Nov. 5, 2015) (citing 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000) (stating that the GAF scale "does not have a direct correlation to the severity requirements

in our mental disorders listings")), *adopted by* 2015 WL 7582339 (N.D. Tex. Nov. 25, 2015). "'Rather a GAF score measures an individual's overall level of functioning and is used for planning treatment and measuring its impact, and in predicting outcome.'" *Id.* (internal quotations omitted) (quoting *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed., rev. 2000) ("DSM–IV–TR")).[4] "The SSA published internal instructions regarding how to continue interpreting GAF scores that appear in medical records, noting that such scores should be treated as opinion evidence." *Id.* (citing SSA Administrative Message 13066 (effective July 22, 2013) ("AM–13066")). As with other opinion evidence, however, GAF scores need "supporting evidence to be given much weight." *Id.* (citations omitted). "It is within the ALJ's province to resolve conflicts when an assigned GAF score by a treating source conflicts with the treating source's own descriptions of the patient's mental symptoms and/or function." *Id.* (citing *Locure v. Colvin*, No. 14–1318, 2015 WL 1505903, at *9 (E.D. La. Apr. 1, 2015)). Even if an ALJ mischaracterizes what a GAF score represents, however, the "error is harmless so long as there is other substantial evidence in the record supporting the ALJ's determinations and it is clear that such errors did not alter the result." *Id.* (citing *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012); *Hardy v. Astrue*, No. 07-2241-LC, 2009 WL 2777167, at *4 (W.D. La. Aug. 31, 2009)).

Here, Dr. Vega rated Plaintiff's GAF as 50 once, "50-55" three times, 55 on five occasions, and 58 once. (*See* doc. 10-1 at 219-22, 261-69.) A GAF score of 41 to 50 indicates a "serious" impairment in social, occupational, or school functioning, and a GAF score of 51 to 60 indicates a "moderate" impairment in social, occupational, or school functioning. *Harris-Nutall v. Colvin*, No.

---

[4] Notably, "in the updated version of the DSM, the American Psychiatric Association no longer recommends the use of the GAF scale as a diagnostic tool for assessing a patient's functioning due to 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'" *Spencer v. Colvin*, No. EP-15-CV-0096-DCG, 2016 WL 1259570, at *6 n.8 (W.D. Tex. Mar. 28, 2016) (quoting *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013) ("DSM–V")); *see also Jackson*, 2015 WL 7681262, at *3.

3:15-CV-3334-D, 2016 WL 3906083, at *6 (N.D. Tex. July 19, 2016) (citing DSM-IV-TR at 34). The ALJ determined that Plaintiff's GAF ratings indicated only moderate impairments in social or occupational functioning, and gave her GAF scores "significant weight" because they were "supported by the record as a whole." (doc. 10-1 at 20, 22-23.) In making this determination, the ALJ considered the treatment records from Dr. Vega, her medical source statement, Dr. Medina's treatment records, Plaintiff's allegations, and the statement from Plaintiff's mother. (*See id*. at 18-23.) Plaintiff's treatment records indicated that she was stable and doing well on several occasions, and she was also oriented, pleasant, in a good mood, and had goal-directed speech on those occasions. (*See id*. at 219-22, 261-69.) She also showed improvement with medication. (*See id*.) Additionally, she only had a recognized GAF score of 50 once, with her GAF being assessed as 50-55 on three other occasions. (*See id*.) While she reported that she had limitations in concentration, following instructions, and completing tasks, she also reported that she was able to drive, prepare meals, watch television, read, use the internet, spend time with friends, handle her personal hygiene, and take care of pets. (*See id*. at 177-83.)

Although Plaintiff argues that the ALJ erred by classifying her GAF scores as moderate, the decision shows that the ALJ specifically considered her scores as well as the other evidence of record in determining the weight to be given to them. (*See id*. at 18-23.) It was "within the ALJ's province to resolve conflicts" in considering Plaintiff's GAF ratings and the other evidence of record, and the record shows that there was "supporting evidence" to give her GAF scores "significant weight." *See Jackson*, 2015 WL 7681262, at *3. "Moreover, even assuming *arguendo* it was error for the ALJ to mischaracterize the GAF scores, any such error is harmless" because there is other "evidence in the record supporting the ALJ's determinations and it is clear that such errors did not alter the result." *Id*. (citing cases).

## B.    Six-Factor Analysis

Plaintiff next argues that the ALJ erred in failing to analyze Dr. Vega's opinions in the medical source statement under the six-factor analysis in 20 C.F.R. § 404.1527(c)(2) and SSR 96-2p. (doc. 13 at 13-19.)

When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id*. §§ 404.1527(c)(2), 416.927(c)(2). If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." 20 C.F.R. § 404.1527(c)(1)–(6); *see* SSR 96-2p, 1996 WL 374188, at *4 (S.S.A. July 2, 1996).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id*. A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id*. at 455–56. Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an

ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

Here, the ALJ discussed the findings in the medical source statement completed by Dr. Vega. (doc. 10-1 at 19.) As noted, she also discussed the treatment records from Dr. Vega, Dr. Medina's treatment records, Plaintiff's allegations, and the statement from Plaintiff's mother. (*See id.* at 18-23.) The ALJ noted that Dr. Vega's own treatment notes indicated that Plaintiff had normal mood and affect, improvement with medications, and no mention of issues with temper control. (*Id.* at 21.) She further discussed Dr. Vega's notes that Plaintiff was stable, doing well, alert, oriented, pleasant, and had goal-directed speech on several occasions, and that her GAF score consistently rated in the moderate range of impairment, showing that she had only moderate limitations "in maintaining concentration, persistence or pace, and adapting and managing oneself." (*Id.* at 18-19, 22.) After reviewing the evidence of record, the ALJ ultimately gave Dr. Vega's opinions in the medical source statement "little weight" because it was "inconsistent with her treatment notes and GAF ratings, which only showed moderate impairments, instead of marked or extreme impairments." (*Id.* at 23.)

Although the ALJ found Dr. Vega's opinions to be inconsistent with her own treatment notes, there were no other treating or examining sources controverting her opinions in the medical source statement. While Plaintiff did see Dr. Medina on occasion, he only treated Plaintiff for migraines and did not provide any information regarding the effects of her mental impairments on

her ability to work. (*See id*. at 223-27, 229-32, 255-59.) Additionally, although the ALJ gave "significant weight" to Plaintiff's GAF scores, these scores do not constitute medical opinions that would directly controvert Dr. Vega's opinions in the medical source statement. *See Bobinger v. Astrue*, No. 1:09-CV-103-C, 2011 WL 1085265, at *5 (N.D. Tex. Mar. 24, 2011) (noting that "a medical opinion as to a claimant's GAF is not automatically reflected in any RFC finding, nor does any particular GAF score necessarily correlate to specific limitations imposed by a claimant's mental impairment"). Because there were no other treating or examining sources controverting her opinions, the ALJ was required to undergo a detailed analysis of the factors set forth in 20 C.F.R. § 404.1527(c)(2) and SSR 96-2p. Her failure to do so was error, and her decision is not supported by substantial evidence. *See Garcia v. Colvin*, No. 3:16-CV-00076-RFC, 2016 WL 6127536, at *5 (W.D. Tex. Oct. 20, 2016).

Having found error, the Court must still consider whether the ALJ's failure to properly evaluate Dr. Vega's opinions in the medical source statement was harmless. *See McNeal v. Colvin*, 3:11-CV-02612-BH-L, 2013 WL 1285472, at *27 (N.D. Tex. Mar. 28, 2013) (applying harmless error analysis to the ALJ's failure to properly evaluate treating opinion under 20 C.F.R. §§ 404.1527(c)). Plaintiff asserts that the ALJ's error was not harmless because if the "medical evidence of record is properly analyzed, a differing listing analysis and RFC may have resulted." (doc. 13 at 8, 18-19.)

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required," and a court "will not vacate a judgment unless the substantial rights of a party are affected." *Mays v. Bowen*, 837 F.2d 1362, 1363–64 (5th Cir. 1988). "[E]rrors are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). In the Fifth Circuit, harmless error

exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. Nov. 28, 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)). Accordingly, to establish prejudice that warrants remand, Plaintiff must show that the ALJ's decision might have been different had she properly considered Dr. Vega's opinions regarding her functional limitations under the relevant factors. *See id.* at 816 (citing *Newton*, 209 F.3d at 458).

Here, Dr. Vega opined that Plaintiff was seriously limited or unable to meet competitive standards for remembering work-like procedures; understanding, remembering, and carrying out short and simple instructions; working in coordination with others; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a reasonable pace; dealing with work stress; responding appropriately to changes in a routine work setting; and getting along with others. (doc. 10-1 at 239-40.) She found that Plaintiff was seriously limited in interacting appropriately with the general public and maintaining socially appropriate behavior. (*Id.* at 240.) She further opined that Plaintiff was unable to understand, remember, and carry out detailed instructions, and that she could be expected to miss more than four days of work per month due to her impairments. (*Id.* at 240-41.) She noted that Plaintiff's highest GAF score in the prior year and at the time of the statement was between 50-55, and her prognosis was fair to guarded. (*Id.* at 237.)

In her decision, the ALJ stated that she "considered the opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527," (*id.* at 22), which required her to give "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s)" controlling weight. 20 C.F.R. § 404.1527(c)(2). The ALJ considered Dr. Vega's opinions and found that they were entitled to only "little weight" because they were "inconsistent with her

treatment notes and GAF ratings . . . ." (*Id*. at 23.)  The ALJ instead gave Plaintiff's GAF scores "significant weight, as they [were] supported by the record as a whole." (*Id*.)  As noted, however, Plaintiff's GAF scores, while relevant, do not constitute opinion evidence that would directly controvert Dr. Vega's opinions in the medical source statement. *See Bobinger*, 2011 WL 1085265, at *5; *see also Hill v. Astrue*, No. H-08-3160 , 2009 WL 2901530 *7(S.D. Tex. Sept. 1, 2009) (noting the GAF scale, while potentially relevant, does not directly correlate to an individual's ability or inability to work).  Although Dr. Vega's opinions in the medical source statement were the only treating source opinions on Plaintiff's ability to perform certain mental activities in the work environment, the ALJ did not attribute controlling weight to her opinions and failed to analyze the factors under 20 C.F.R. § 404.1527(c)(2).

Given the significance attributed to treating source opinions by the Social Security Regulations, it is impossible to ignore the impact that the ALJ's error had on the disability determination. *See generally* 20 C.F.R. § 404.1527.  As noted, there were no other treating source opinions in the record regarding Plaintiff's mental impairments, and the ALJ declined to give Dr. Vega's opinions significant weight due to their inconsistency with her treatment notes and Plaintiff's GAF scores. (doc. 10-1 at 23.)  If the ALJ had considered Dr. Vega's opinions under the six factors, however, she might have found that they were entitled to greater weight.  With no other treating source opinion on Plaintiff's mental limitations, she might have also ordered a consultative examination, re-contacted Dr. Vega, or requested additional evidence. *See* 20 C.F.R. § 404.1520b(b) (explaining that to resolve inconsistency or insufficiency, the Commissioner may re-contact medical source, request additional evidence, or order a consultative examination).

Although the record shows that Plaintiff's symptoms had improved with treatment, it is not inconceivable that the ALJ would have reached a different conclusion had she properly considered

and weighed Dr. Vega's opinions under the six-factor analysis. *See Conte v. Comm'r, SSA*, No. 4:16-CV-00048-CAN, 2017 WL 1037570, at *7 (E.D. Tex. Mar. 16, 2017) (finding the ALJ's improper consideration of a treating source opinion was not harmless error when there was no contrary opinion from a treating source in the record). Further, if the ALJ reached a different conclusion and provided greater limitations as to Plaintiff's ability to work based on Dr. Vega's opinion, this would have impacted the VE's testimony and may have led to a different conclusion regarding Plaintiff's disability status. Even if the ALJ attributed the same weight to Dr. Vega's opinion after conducting the six-factor analysis under 20 C.F.R. § 404.1527 and SSR 96-2p, it is not the duty of the reviewing court to "substitute its judgment of the facts for the ALJ's, speculate on what the ALJ could have done or would do on remand, or accept a *post hoc* rationalization." *See Benton v. Astrue*, No. 3:12-CV-0874-D, 2012 WL 5451819 at *8 (N.D. Tex. Nov. 8, 2012); *see also Newton*, 209 F.3d at 455 (explaining that the Commissioner's decision must stand or fall with the reasons stated in the ALJ's final decision).

In conclusion, the ALJ's error was not harmless because it is not inconceivable that she would have reached a different decision had she formally considered Dr. Vega's opinions under 20 C.F.R. § 404.1527(c) and SSR 96-2p.[5] *See Singleton v. Astrue*, No. 3:11-CV-2332-BN, 2013 WL 460066 at *6 (N.D. Tex. Feb. 7, 2013) (finding the ALJ's failure to consider a medical source opinion was not harmless error because the court could not say what the ALJ would have done had he considered the opinion, and had he considered the opinion he might have reached a different

---

[5] Plaintiff also appears to assert that the ALJ erred in failing to fully develop the record. (doc. 13 at 17-19.) To the extent she asserts this as a separate issue, it is unnecessary to reach this argument because the ALJ's error in evaluating Dr. Vega's opinions necessitates remand.

decision); *see also McNeal*, 2013 WL 1285472, at *27.[6]

## IV.   CONCLUSION

The Commissioner's decision is **REVERSED**, and the case is **REMANDED** to the Commissioner for further proceedings.

**SO ORDERED**, on this 18th day of September, 2019.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[6] Plaintiff requests "reasonable attorney's fees pursuant to the Equal Access to Justice Act" (EAJA).  (doc. 13 at 20.)  Under the EAJA, the Court must award attorney's fees and expenses if (1) the claimant is the "prevailing party"; (2) the Government's position was not "substantially justified"; and (3) there are no special circumstances that make an award unjust.  *Murkeldove v. Astrue*, 635 F.3d 784, 790 (5th Cir. 2011) (citing 28 U.S.C. § 2412(d)(1)(A)).  To the extent Plaintiff seeks attorney's fees, she may file a post-judgment request under Federal Rule of Civil Procedure 54(d)(2) that also complies with the applicable Local Rules for the Northern District of Texas.